UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE
COMMISSION

Plaintiff,

v.                                                          Case No. 8:26-cv-00993

GIANOPLUS CONSORTIA LLC a/k/a
GIANOPLUS CONSORTIA, LLC,
MICHAEL PETER GIANOPLUS, and
TRACI LEIGH BRANSFORD-MARQUIS,

Defendants,

_____/

**COMPLAINT FOR PERMANENT INJUNCTIVE AND OTHER RELIEF
AND DEMAND FOR A JURY TRIAL**

Plaintiff Securities and Exchange Commission alleges:

**I.      INTRODUCTION**

1.      The Commission brings this action to permanently enjoin Defendants from violating the federal securities laws and for other relief. From no later than March 2021 through at least January 2025, Defendants Michael Peter Gianoplus ("Gianoplus") and Traci Leigh Bransford-Marquis ("Bransford")—acting through Defendant Gianoplus Consortia LLC a/k/a Gianoplus Consortia, LLC ("GC")— misappropriated at least $2.4 million from investors who participated in a purported high-yield investment program ("HYIP") offered through GC. During that period,

- 1 -

GC raised more than $6 million from at least eight investors, in the United States and elsewhere, through the offer and sale of securities in the HYIP. In connection with the offer and sale of those securities, Defendants engaged in a scheme to defraud investors and engaged in practices that operated as a fraud or deceit upon those investors.

2.     The HYIP purported to provide investors with access to exclusive overseas platforms trading obscure financial instruments with the promise of extraordinary short-term profits. Gianoplus developed the HYIP and personally sourced the investments. Bransford served as the escrow attorney and paymaster, and the agreements between GC and the investors provided that principal funds from investors would be "safe haven[ed]" and "protected" in Bransford's Interest On Lawyers' Trust Accounts ("IOLTA") with "sub" accounts to be established to receive profits from the investments on behalf of the investors. Critically, the agreements stated that investors' principal funds would be returned at the conclusion of the HYIP, and GC would be paid a share of the profits generated on the investments, with Bransford in turn being paid her fee from GC's profit share.

3.     Despite the promotional hype of the HYIP, it did not yield any profits on the investments during the relevant period. Nevertheless, Defendants still paid themselves in excess of $2.4 million in principal funds from investors, in direct contravention of the agreements and notwithstanding that Defendants had led investors to believe their principal would be protected. Moreover, in some instances, principal funds from investors were not invested through the HYIP at all—instead,

Defendants simply retained and misappropriated the entirety of those funds for their own personal use. And when confronted by investors with requests for status updates or redemptions, Defendants concealed the misappropriation through a series of excuses and other deceptive acts.

4.      As a result of the conduct alleged in this Complaint, Defendants violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]. Unless restrained and enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

5.      The Commission therefore respectfully requests that the Court: (i) permanently restrain and enjoin Defendants from violating the federal securities laws, and from engaging in certain further conduct; (ii) direct GC and Gianoplus to pay disgorgement with prejudgment interest on a joint and several basis; (iii) direct Bransford to pay disgorgement with prejudgment interest; and (iv) direct each Defendant to pay a civil money penalty.

## II.     DEFENDANTS

6.      GC is a limited liability company organized in Florida, with a principal place of business in Sarasota, Florida. During the relevant period, Gianoplus served as its principal officer, control person, and sole owner and employee as described below. Gianoplus originally formed GC as "Gianoplus Consortia LLC" on or about September 30, 2021, but later, on or about May 1, 2025—and shortly after giving testimony in the Commission's investigation that preceded the filing of this action—

Gianoplus voluntarily dissolved the entity. He subsequently formed "Gianoplus Consortia, LLC" on or about October 3, 2025.

7. Gianoplus, age 65, is a resident of Sarasota, Florida. During the relevant period, he was the principal officer, control person, and sole owner and employee of GC. In that capacity, he directed the HYIP and all aspects of GC's business, including its management, policies, affairs, operations, investments, online presence, communications with investors, and finances, and had control of the company's bank accounts. By virtue of his status as an officer and control person of GC, the actions he undertook as described more fully herein are imputed to the company.

8. Bransford, age 62, is a resident of Houston, Texas. During the relevant period, she served as the escrow attorney and paymaster responsible for safeguarding principal funds from investors in the HYIP in her IOLTA accounts that she controlled, and for distributing profits from investments. She also was to interface with the various trading platforms to coordinate the investments. Bransford is an attorney licensed in the state of New York. She was previously licensed in the states of Virginia and Texas, but in 2020, she was disciplined in Virginia by a three-judge panel of the Circuit Court for the City of Chesapeake and her law license was suspended initially for 30 days and later forfeited. She was also reciprocally censured in New York by a panel of the Supreme Court of New York, Appellate Division, First Department, for the conduct leading to the Virginia suspension. Later, in 2025, Bransford moved to resign from the Texas Bar in lieu of discipline stemming from a private action instituted by an investor

in the HYIP, and the Supreme Court of Texas subsequently canceled her law license.

## III.   JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa(a)].

10.    The Court has personal jurisdiction over Defendants, and venue is proper in the Middle District, pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], because, among other things, Gianoplus resides in the Middle District, GC has its principal place of business in the Middle District, and some or all of the acts and transactions in which Defendants engaged and that constitute violations of the federal securities laws occurred in the Middle District.

11.    In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, have made use of the mails or the means or instrumentalities of interstate commerce—namely, through Defendants' use of the internet, telephone, and email correspondence when engaging in the acts and transactions described herein.

## IV.   FACTUAL BACKGROUND

### A.   GC's Business

12.    According to Gianoplus, GC operated during the relevant period in the so-called private structured investment program industry, which essentially fell under

the general rubric of alterative private equity. GC catered predominantly to wealthier investors looking for high-yield investments that generated lucrative returns over a one-year or multi-year period.

13.     The company's business model consisted of sourcing foreign investment opportunities for the HYIP, frequently offered through obscure development projects in which the foreign counterparties sought to monetize financial instruments such as bank guarantees or standby letters of credit. According to Gianoplus, GC then would "shop" these opportunities around to banks or overseas trading platforms in Europe, Hong Kong, Singapore, or elsewhere to gauge interest and assess the profit potential. GC would act in different capacities depending on the particular opportunity—at times, as "introducer," and at others, as "strategist" or "broker."

14.     GC relied on a network of so-called master brokers to introduce and refer investors to the company. GC provided the brokers with a "punch list," prepared by Gianoplus, that described the various foreign investment opportunities in the HYIP that Gianoplus personally had sourced. He updated the punch list as new opportunities arose, and on occasion, removed opportunities from the list that had been suspended or otherwise discontinued. Gianoplus also conducted various trainings via Zoom with the brokers to explain the opportunities.

15.     If prospective investors expressed interest in one of the investment opportunities in the HYIP, the broker would provide them with an application to complete and return along with supporting documentation. The broker would forward those materials to Gianoplus who then would contact the prospective investors himself

and set up meetings or telephone calls to discuss the investment opportunities in further detail.

**B.    The HYIP**

16.    GC's website—which was accessible to investors in the United States and controlled by Gianoplus during the relevant period—marketed the HYIP as a "type of investment opportunity that is typically offered to a select group of high net worth entities or institutional investors." The website further described the program as "low-risk, high return investment opportunities." Notably, GC labeled itself on the website with the moniker "Global Safe Haven Finance" and further defined the HYIP as, among other things, "Safe Haven of Principal with the Opportunity for High Yields" and "High Yield with Principal Protection."

17.    According to Gianoplus, GC's characterizations of the HYIP as "safe haven" referred to investors' principal funds—that is, the principal purportedly was not to be "used" as part of the program but instead was to be "secure[d]" and returned in full at the end of the program, with the funds merely serving to leverage the credit line associated with the trading platform in the various investment opportunities. Moreover, Gianoplus admitted that (i) GC was not entitled to a "finder's fee" or any other portion of an investor's principal; (ii) instead GC was to be compensated for its role in the HYIP solely through its share of the profits generated from the investments; and (iii) on average, its profit share was about 25% after expenses.

18.    To convince prospective investors to invest through the HYIP, Gianoplus represented, among other things, that there were "many" investors already

participating in the HYIP and that the program helped these individuals "get rich." Documentation provided by GC through Gianoplus to prospective investors described the invitation to participate in the HYIP as a "privilege" and lauded the program's purported "unparalleled yields in combination with little or no related risk." As a further enticement, Gianoplus emphasized that principal funds from investors would remain "safe" in Bransford's IOLTA accounts, and would be returned in full at the end of the trading program along with the investor's share of the profits. In some instances, Gianoplus would convey a sense of urgency by stressing that a particular investment opportunity could "close" at any time and that another opportunity might not be available.

19.    Once investors decided to participate in the HYIP, Gianoplus provided them with an investment agreement styled as a "Joint Venture Agreement" ("JVA"). At least seven investors signed a JVA during the relevant period, with Gianoplus counter-signing on behalf of GC as its principal. Bransford was designated in the JVA as the attorney and paymaster, with her IOLTA accounts listed as both the receiving and distribution account for the investments.

20.    Most of the JVAs cryptically referred to the investment without further elaboration as "an interest in a financial instrument" or "a partial interest in a financial program," with varying purported valuations ranging from $100 million to over $1 billion. Other JVAs described the investment simply as a "private investment program" or "private placement program."

21.    Despite its nomenclature as a "joint venture," the JVAs limited the

investor's role to wiring his or her principal funds to Bransford's IOLTA accounts or GC's bank accounts. Investors did not have the ability to control the investment, nor did the JVAs grant them any governance or management rights with respect to the investment. Instead, Gianoplus, through GC, retained the exclusive right to select the trading platform that would manage the overseas credit line associated with the investment and ultimately generate the profit returns stated in the JVA. That right, according to Gianoplus, also gave him the ability to change the investment without prior notice to the investor, and on occasion, principal funds could "sit" in Bransford's IOLTA accounts pending his selection of the trading platform. Gianoplus admitted, however, that in the interim, an investor's principal funds would remain untouched in Bransford's IOLTA accounts to keep the accounts active.

22.    Depending on the JVA and the length of the particular investment program, the profit returns varied, but encompassed such ranges as 9% per quarter, 25% for a three-month period, 20% for a five-month period, or even an astonishing 100% for a two-month period. According to Gianoplus, the various trading platforms set these profit margins, and his verification thereof was limited to "word of mouth" references from other traders or bankers who had worked previously with the platforms. That notwithstanding, Gianoplus admitted that despite these stated margins, GC never had an instance where an investor earned 100% profit in 10 days or one month, or even 50% in one month.

23.    The JVAs had a number of other salient provisions in common, including, among others: (i) the investor's principal funds would be returned at the

conclusion of the program, along with the stated profit returns; (ii) the stated profit returns would be paid first to the investor and then any remaining returns generated would be paid to GC; (iii) GC would use its share of the profit returns to pay Bransford her fee for serving as attorney and paymaster; (iv) Bransford would be representing both GC and the investor in connection with the HYIP; (v) Brandford would "oversee all movement" of funds in her role as attorney and paymaster, would establish "sub accounts" from her IOLTA accounts to receive the investor's principal funds and his or her share of the profit returns, and would distribute the profit returns from the trust account; and (vi) the JVA represented the entire agreement between the parties and could only be changed, altered or amended in writing and signed by all parties. Some of the JVAs further emphasized the status of an investor's principal funds throughout the pendency of the HYIP, stating that the funds are "safe-guarded by the escrow attorney"—*i.e.*, Bransford—that the funds are "always protected," and that the HYIP is "designed to safe-haven client principal."

24.    Investments in the HYIP were offered and sold as investment contracts constituting securities. Investors committed principal funds to participate in the HYIP but ceded control over the direction and management of their investments to Defendants. Investors shared in the risks and benefits of the HYIP, and their fortunes were interwoven with and dependent upon the efforts and success of Defendants, from which the investors derived an expectation of profits or returns on their investments.

25.    Of the at least eight investors who participated in the HYIP:

(a)    Investor 1 invested approximately $350,000 initially, followed by

- 10 -

a second investment of approximately $2.5 million. Investor 1 wired the funds to one of Bransford's IOLTA accounts on March 2, 2021 and April 15, 2021, respectively;

(b) Investor 2 invested $350,000, and wired the funds to one of Bransford's IOLTA accounts on March 5, 2021 and March 8, 2021;

(c) Investor 3 invested approximately $650,000, and wired the funds to one of Bransford's IOLTA accounts on May 28, 2021;

(d) Investor 4 invested $550,000, and wired the funds to one of Bransford's IOLTA accounts on June 4, 2021;

(e) Investor 5 invested $1 million, and wired the funds to one of Bransford's IOLTA accounts on June 25, 2021;

(f) Investor 6 invested $350,000, and wired the funds to one of Bransford's IOLTA accounts on September 7, 2021;

(g) Investor 7 invested $250,000, and wired the funds to GC's bank account on February 7, 2022; and

(h) Investor 8 invested $150,000, and wired the funds to GC's bank account on May 2, 2022.

26. Beyond her role as the designated escrow attorney and paymaster, the JVAs also imbued Bransford with the responsibility of interfacing with the trading platforms to coordinate the investments. Indeed, some of the agreements stated Bransford was to "contact the desk so they may make arrangements to use their credit line and inject said credit line into an ongoing trade program," while others stated she would "wire [funds] . . . to the trade platform holding account." Additionally, the

agreements highlighted her central involvement in the HYIP: (i) "This JVA is orchestrated by the GC appointed attorney . . . ."; (ii) "[T]he process is orchestrated by Gianoplus Consortia [GC] and the escrow attorney Traci B. Marquis, esq."; or (iii) "This JVA is orchestrated with the GC appointed paymaster . . . ."

27. Gianoplus emailed Bransford on August 24, 2021, and told her, among other things, to advise one of the investors that his funds were under Bransford's "control," and that "[w]e do not trade client's funds. We trade a credit line associated with client funds." He also told Bransford that "the trade desk[] accounts" were under her "direction and authority," and that "[w]e are responsible for the client's funds, per our agreement." He further stated that "[y]our IOLTA account is used to receive client funds and distribute profits and principal at the end of the trade program."

28. Although not a signatory to the JVAs herself, Bransford nevertheless acknowledged the JVAs and her role in the HYIP at various points during the relevant period. For example:

(a) On March 12, 2021, she emailed Gianoplus a confirmation from her IOLTA account that she had wired $610,000 in investor funds to one of the trading platforms. Later, on May 21, 2021, she received an email confirmation that an additional wire from her IOLTA account in the amount of $1,600,000 in investor funds had been sent to the trading platform. Bank records for Bransford's IOLTA accounts substantiate these transactions, and also reflect an additional wire in the amount of $900,000 on July 21, 2021, to another trading platform;

(b) She entered into a limited power of attorney with at least one

- 12 -

investor on or about June 25, 2021, in which she agreed, among other things, to accept and hold the investor's principal funds in her IOLTA account, to secure those funds per the investor's JVA, and to make disbursements in accordance with the JVA. Moreover, she further agreed in the limited power of attorney that her responsibilities "carry a fiduciary duty toward" the investor—a duty that she later acknowledged in an email to the same investor on December 12, 2022 ("the "December 12 Email");

(c)     On June 25, 2021, she emailed an investor confirmation of receipt of the investor's principal funds in her IOLTA account;

(d)     On February 15, 2022, she told an investor in an email that she would "show proof of [f]unds. Money is still there.";

(e)     She co-signed a letter with Gianoplus to GC's clients on February 15, 2022 (the "February 15 Letter"), in which she acknowledged, among other things, that she (i) "orchestrated" the movement of funds to a new trading platform purportedly because the prior platform was "not ready to perform"; (ii) would "signal" GC when the trading returns "hit and cleared to her escrow account for distribution"; (iii) "orchestrates – as a paymaster only – the movement and blocking of funds – and then the distribution of profits"; (iv) would notify GC when the profits are ready and in her "sub" accounts "to be distributed"; and (v) was signing the letter to "attest[] to the accuracy of the information provided," that the "start and stop dates" were at the discretion of the trading platform, and this information "is stated in all executed agreements."; and

(f)     In an email to an investor on March 31, 2022 (the "March 31

Email"), she stated, among other things, "I thank you for your trust in Gianoplus Consortia and me in holding your money in escrow during this transaction."

### C.    Defendants Defrauded And Deceived GC's Investors

29.    Despite (i) GC's and Gianoplus's characterizations of the HYIP as "safe haven" in that investors' principal funds were not "used" as part of the program but merely served to leverage the credit line associated with the trading platform with the principal funds to be returned in full at the end of the program, (ii) Bransford's acknowledgement of her responsibilities under the JVA, and (iii) that Defendants only were to be compensated from the profits generated by the HYIP, investors' principal funds did not "sit" or remain untouched in Bransford's IOLTA accounts throughout the relevant period, as Gianoplus said they would, but instead were almost immediately misappropriated by Defendants.

30.    Indeed, bank records for Bransford's IOLTA accounts reflect disbursements of investors' principal funds to Defendants and their affiliates, in direct contravention of the JVAs and notwithstanding that Defendants had led investors to believe their principal would be protected. These disbursements in large part followed a similar pattern—that is, they were made within a matter of days of the deposit of an investor's principal funds, and sometimes as soon as the next day, and frequently in parallel increments. For example, after receiving Investor 1's initial investment of approximately $350,000 on March 2, 2021 and the remainder of Investor 2's investment of $350,000 on March 8, 2021, the next day Bransford wired $20,000 to her business account, $20,000 to Gianoplus, and $20,000 to one of Gianoplus's

affiliates. Almost a month later, she wired $10,000 each to her business account, to Gianoplus, and to his affiliate. Likewise, less than a week after Investor 1's second investment of approximately $2.5 million on April 15, 2021, Bransford wired $200,000 each to her business account, to Gianoplus, and to his affiliate.

31.     Of the over $6 million in principal funds received as part of the HYIP, as described in Paragraph 25 above, Defendants misappropriated at least $2.4 million for their own personal use during the relevant period, with Bransford receiving at least $1.49 million and Gianoplus at least $975,000. Bank records for Bransford's IOLTA accounts show disbursements of investors' principal funds to, among others, Bransford's business account, her personal trust account, and an account in the name of a Texas-based film production company managed by Bransford and her daughter, an aspiring actor and filmmaker. The latter two accounts received over $1.13 million that Bransford appears to have used to produce a film written by and co-starring her daughter on the campus of a university in New Jersey. The university later sued Bransford and others for unpaid fees associated with the filming.

32.     Bank records for Bransford's IOLTA accounts also show disbursements of investors' principal funds of at least $472,000 to Gianoplus personally, and at least $375,000 to one of Gianoplus's affiliates purportedly as repayment for unrelated prior loans the affiliate had made for Gianoplus's and GC's benefit. Bank records for GC's bank account further show disbursements of investors' principal funds of at least $128,000, consisting of, among other things, transfers to Gianoplus's personal accounts, ATM cash withdrawals, and retail and other apparent living expenditures.

33.    Of the at least eight investors who participated in the HYIP, only three purported investments were made as part of the program during the relevant period and principal funds from at least two investors were not invested in the program at all. Bank records for Bransford's IOLTA accounts show wires to one trading platform on March 12, 2021 and May 21, 2021 for $610,000 and $1,600,000, respectively, and a subsequent wire to a second trading platform on July 21, 2021 for $900,000. Similarly, bank records for GC's bank account show a wire to a third trading platform on February 10, 2022 for $225,000.

34.    Despite the promotional hype associated with the HYIP and the stated extraordinary profit returns, the program did not generate any returns during the relevant period. Indeed, bank records for Bransford's IOLTA accounts and GC's bank account do not reflect any deposits during the relevant period associated with the HYIP other than principal funds from investors.

35.    Having developed the HYIP with the enticement to prospective investors of the security of their principal funds, having signed the JVAs on behalf of GC as its principal, and having admitted that any compensation to be paid to GC as part of the HYIP would come only from profits generated from the program, and in his capacity as principal of GC with control over its financial accounts from which and into which investors' principal funds were transferred, Gianoplus knew, was reckless in not knowing, or, at a minimum, should have known that misappropriation of investors' principal funds for his own benefit and the benefit of others was prohibited.

36.    Having acknowledged her role in the HYIP as the escrow attorney,

paymaster, and orchestrator, having received investors' principal funds in her IOLTA accounts, and having acknowledged her fiduciary duty to secure investor's principal funds in accordance with the JVAs, Bransford knew, was reckless in not knowing, or, at a minimum, should have known that misappropriation of investors' principal funds for her own benefit and the benefit of Gianoplus and others was prohibited.

37.    This misappropriation was material because a reasonable investor would expect his or her principal funds to be used in accordance with the JVA and would also expect Defendants to compensate themselves only in a manner authorized under the JVA, and would find this misappropriation to be important in making an investment decision.

38.    By virtue of misappropriating investors' principal funds, Defendants defrauded and deceived GC's investors.

**D.    Defendants Concealed the Fraud and Deception from Investors**

39.    At various points during the relevant period, Defendants engaged in conduct to conceal their disbursement and misappropriation of investors' principal funds, lulling investors to believe their investments had been made and their principal was protected. Defendants effectuated their concealment through repeated excuses as to why profit returns were not being paid, and a series of other deceptive acts.

40.    For example, in emails to investors Gianoplus stated, among other things:

(a)    On October 7, 2022, that a bank was sending GC a "formal letter stating the release has been delayed and their expected release date," and that he was

"not happy" with the bank's "lateness";

(b)     On August 28, 2023, that the "trade desk" and the bank had told him the "payout is coming the first week of September," and that he was "working with the bank's and trader's attorneys to verify/confirm an actual date";

(c)     On February 6, 2024, that he was "in Austria and then Switzerland – meeting with bankers," and "[w]e have been pushing them with attorneys and I had to come an[d] sit on them";

(d)     On April 19, 2024, that "we do not have control over platform/bank delays," but "[w]e have attorneys pushing those entities for results";

(e)     On July 12, 2024, that a "major deal" was "frozen" until the banks "release[d] the funds";

(f)     On July 24, 2024, that GC was "moving stones" with the banks to pay the profit returns, and that "[w]e are almost there," in spite of delays caused by a "microsoft [sic] patch";

(g)     On September 22, 2024, that the delays were due to "a dry bank liquidity issue" and "internal issues and consolidations," further noting that investors' "patience" would be "rewarded soon";

(h)     On September 25, 2024, that the delays were due to "bank regulations," and that the release of profit returns was "starting" with the platforms having "fixed their liquidity issues"; and

(i)     On October 8, 2024, that "the new delay has to do with transfer registry protocols," and that he was "pushing for the release of funds."

41.    Notwithstanding these excuses, however, and as described in Paragraph 33 above, only three investments were made as part of the HYIP during the relevant period, and principal funds from at least two investors were not invested in the program at all. In his capacity as principal of GC with control over the HYIP, Gianoplus knew, was reckless in not knowing, or, at a minimum, should have known these excuses would lull investors to believe their investments had been made and their principal was protected, and that these acts would conceal his conduct. These acts were material because a reasonable investor would find it important in making an investment decision that his or her principal funds were not used in accordance with the JVA.

42.    Moreover, Gianoplus sent an email on November 1, 2022, informing an investor that the bank would "clear" his payment "from profits," and that GC would "have it cleared to distribute" by November 11, 2022. When that still had not materialized over a year later, the investor became frustrated, writing in an email to Gianoplus on November 24, 2023 that "[t]his is just getting ridiculous and really worries me," and further stating, among other things, "please don't tell me oh, they'll have it all sorted out by the end of the week, or next week, or the end of the month . . . you've told me that at least 6 times." Gianoplus later replied in an email on December 4, 2023, stating "Sit tight. I am securing a return of your principal and profits." The communications continued throughout 2024 and even into 2025, with Gianoplus emailing the investor on January 10, 2025, stating "Your principal is still being held by the bank in Europe."

43.     Notwithstanding these communications, bank records for GC's bank account show that within a matter of days after the investor had wired his principal funds to GC, Gianoplus began disbursing those funds to himself and others in direct contravention of the JVA, and that by November 20, 2023, the balance in the account was just under $300. In his capacity as principal of GC with control over its financial accounts from which and into which investors' principal funds were transferred, Gianoplus knew, was reckless in not knowing, or, at a minimum, should have known these communications would lull the investor to believe his investment had been made and his principal was protected, and that these acts would conceal Gianoplus's conduct. These acts were material because a reasonable investor would find it important in making an investment decision that his or her principal funds were not used in accordance with the JVA.

44.     Bransford also engaged in conduct to conceal the disbursement and misappropriation of investors' principal funds, lulling investors to believe their investments had been made and their principal was protected. For example:

(a)     Despite the requirement under the JVAs to establish "sub accounts" to receive an investor's principal funds and his or her share of the profit returns, bank records for Bransford's IOLTA accounts show that she did not establish any such "sub accounts" during the relevant period;

(b)     In the February 15 Letter, Bransford and Gianoplus told investors, among other things, that "COVID and Brexit" had caused "long delays with traders and banks" and that the trading platforms had been "locked down";

(c)     In addition, in the February 15 Letter, Bransford and Gianoplus noted that some of GC's clients had asked to see screenshots of their principal funds, but Bransford and Gianoplus rejected the request, stating emphatically in the letter that "[w]e do not provide that information nor does the attorney";

(d)     In the March 31 Email, Bransford told an investor that he would be receiving a letter from GC "on a schedule of payouts based on the banking, trading and political climate"; and

(e)     In the December 12 Email, Bransford stated, among other things, that she "expect[s] GC to be paying profits starting the end of this week, hopefully," but that GC needed to "get[] a better picture of the trade and funds that will be released."

45.     Notwithstanding these excuses, however, and as described in Paragraph 33 above, only three investments were made as part of the HYIP during the relevant period, and principal funds from at least two investors were not invested in the program at all. In her capacity as the escrow attorney, paymaster, and orchestrator of the HYIP, Bransford knew, was reckless in not knowing, or, at a minimum, should have known these excuses would lull investors to believe their investments had been made and their principal was protected, and that these acts would conceal her conduct. These acts were material because a reasonable investor would find it important in making an investment decision that his or her principal funds were not used in accordance with the JVA.

46.     In addition, on April 13, 2022, an investor questioned a GC

representative as to when he would receive his profit returns. The representative responded the following day, writing "The bank in NY is expected to release funds to be wired to [Bransford] this upcoming Monday. So next week." After the profit returns were not paid, the investor then sought redemption of his principal funds in July 2022 and again in October 2022, and signed GC's redemption request form on November 4, 2022. Among other things, the form set out a purported payment schedule for the return of the principal funds, beginning on or about November 18, 2022, and continuing in 2-3 week increments thereafter. Notwithstanding the payment schedule, bank records for Bransford's IOLTA accounts show that by February 28, 2022— months before the investor had inquired about his investment—Bransford improperly had disbursed and misappropriated the entirety of that investor's principal funds, along with the entirety of another investor's principal funds.

47.    Moreover, Bransford furthered concealment of the scheme in the December 12 Email. She told the investor that she had previously caused a screenshot from one of her IOLTA accounts to be provided to the investor, purportedly showing the entirety of that investor's principal funds secured in the account. The screenshot was as of September 9, 2021, and was of a different IOLTA account than the one to which the investor had wired funds. Bransford established that latter account on or about March 31, 2021. But the screenshot was not of the investor's principal funds as Bransford led the investor to believe—instead, it was of the total balance in the IOLTA account and reflected fund movements Bransford undertook on the same day as the screenshot so the account balance matched that of the investor's principal investment.

48.    In her capacity as the escrow attorney, paymaster, and orchestrator of the HYIP with control over her IOLTA accounts, Bransford knew, was reckless in not knowing, or, at a minimum, should have known the communications described in Paragraphs 46 and 47 above, would lull investors to believe their investments had been made and their principal was protected, and that these acts would conceal her conduct. These acts were material because a reasonable investor would find it important in making an investment decision that his or her principal funds were not used in accordance with the JVA.

49.    By virtue of concealing the misappropriation of investors' principal funds, Defendants furthered the scheme to defraud and deceive GC's investors.

## COUNT I

## Fraud in Violation of Section 17(a)(1) of the Securities Act

### (Against all Defendants)

50.    The Commission repeats and realleges Paragraphs 1 through 49 of the Complaint.

51.    By engaging in the conduct described in the Complaint, Defendants, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed a device, scheme or artifice to defraud.

52.    By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Fraud in Violation of Section 17(a)(3) of the Securities Act

### (Against all Defendants)

53. The Commission repeats and realleges Paragraphs 1 through 49 of the Complaint.

54. By engaging in the conduct described in the Complaint, Defendants, in the offer or sale of securities by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly, recklessly, or negligently engaged in a transaction, practice or course of business which operated or would operate as a fraud or deceit upon the purchaser of such securities.

55. By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT III

### Fraud in Violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act

### (Against all Defendants)

56. The Commission repeats and realleges Paragraphs 1 through 49 of the Complaint.

57. By engaging in the conduct described in the Complaint, Defendants directly or indirectly, by the use of the means or instrumentalities of interstate

commerce, or of the mails, knowingly or recklessly employed a device, scheme or artifice to defraud, in connection with the purchase or sale of securities.

58. By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a)].

## COUNT IV

### Fraud in Violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act

### (Against all Defendants)

59. The Commission repeats and realleges Paragraphs 1 through 49 of the Complaint.

60. By engaging in the conduct described in the Complaint, Defendants directly or indirectly, by the use of the means or instrumentalities of interstate commerce, or of the mails, knowingly or recklessly engaged in an act, practice or course of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of securities.

61. By reason of the foregoing, Defendants violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c)].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find that Defendants committed the violations charged and that, as a result of these violations, Defendants received ill-gotten gains; and enter final judgments:

### I.

### Permanent Injunctions

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from directly or indirectly violating the federal securities laws alleged in the Complaint by committing or engaging in specified actions or activities relevant to such violations, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)].

### II.

### Conduct-Based Injunctions

Permanently restraining and enjoining GC and Gianoplus directly or indirectly, including but not limited to, through any entity they own or control, from participating in the issuance, purchase, offer, or sale of any security, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; provided however, that such injunction shall not prevent Gianoplus from purchasing or selling securities for his own personal accounts; and further permanently restraining and enjoining Bransford directly or indirectly, including but not limited to, through any entity she owns or controls, from

participating in, including acting as a paymaster in connection with, the issuance, purchase, offer, or sale of any security, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)]; provided, however, that such injunction shall not prevent Bransford from purchasing or selling securities for her own personal account. As used here, the term "paymaster" refers to someone who serves as an intermediary who receives funds from an investor and disburses them pursuant to instructions.

## III.

## **Disgorgement**

Ordering GC and Gianoplus to disgorge their ill-gotten gains on a joint and several basis, plus prejudgment interest, and further ordering Bransford to disgorge her ill-gotten gains, plus prejudgment interest, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5), (7)].

## IV.

## **Penalties**

Ordering each Defendant to pay a civil money penalty, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## V.

## **Further Relief**

Granting any other and further relief the Court may deem just or necessary.

## VI.

## Retention of Jurisdiction

Further, the Commission respectfully requests the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## JURY DEMAND

The Commission demands a trial by jury as to all claims so triable.

DATED:  April 7, 2026                    Respectfully submitted,

                              By:    /s/ Patrick R. Costello
                                     Patrick R. Costello
                                     Florida Bar No. 75034
                                     SECURITIES AND EXCHANGE
                                     COMMISSION
                                     100 F. Street NE
                                     Washington, DC 20549
                                     Tel: (202) 551-3982
                                     Email: costellop@sec.gov

                                     *Lead Counsel for Plaintiff*